# Highlands, Appellant, v. Philadelphia & Reading Railroad Company.

*Evidence—Fraud—Equitable defense—Common-law action.*

Under the mixed system of jurisprudence which prevails in Pennsylvania, it is permitted in a common-law action to interpose an equitable defense, which, however, to be successful must be supported by proof of a character and degree that will satisfy the conscience of a chancellor.

Where the character and measure of proof are sufficient to satisfy the conscience of the trial judge were he sitting as a chancellor, that the party is entitled to the equitable relief he seeks, the case should be submitted with proper instruction to the jury, and a verdict in accordance with the proof should be sustained. If, when such proof is submitted the judge refuses to send the case to the jury, or having submitted it to the jury and the verdict is in accord with the proof but is set aside, the action of the court may be reviewed, and the right of the party to equitable relief may be enforced on appeal.

*Evidence—Reformation of written instrument—Fraud.*

In order to reform a written instrument on the ground of fraud, accident or mistake, the proof must be clear, precise and indubitable. What is meant by "indubitable" proof in connection with such cases, is evidence

that is not only found to be credible, but of such weight and directness as to make out the facts alleged beyond a reasonable doubt.

In an action against a railroad company to recover for the loss of property burned through the alleged negligence of the defendant in permitting sparks to be emitted from a locomotive, the defendant set up a release given by the plaintiff to the defendant company in full for all claims for loss sustained in consequence of the fire. The plaintiff testified that the release was for the value of the property which was uninsured, which was about one third of the value of the whole property destroyed. He further testified that not being able to read at the time, the agent of the defendant read the release to him as if it were only for the uninsured property, and that he had signed it on the assurance that it was so written. All of the negotiations leading up to the release tended to sustain plaintiff's testimony, and it was fully corroborated by the testimony of his wife. It was contradicted by the agent. Another witness, however, testified that the agent had said that he had paid plaintiff for that part of his property destroyed by the fire that was not insured. *Held,* that the evidence was sufficient to justify a chancellor in reforming the release.

MITCHELL, C. J., dissents.

Argued April 25, 1904.    Appeal, No. 301, Jan. T. 1903, by plaintiff, from judgment of C. P. Cumberland Co., Sept. T., 1902, No. 102, on verdict for defendant non obstante veredicto in case of Edward Highlands v. Philadelphia & Reading Railroad Company.    Before MITCHELL, C. J., DEAN, BROWN, MESTREZAT and THOMPSON, JJ.    Reversed.

Trespass to recover damages for the loss of property alleged to have been burnt by defendant's negligence.    Before E. W. BIDDLE, P. J.

The facts are stated in the opinion of the Supreme Court.

*Error assigned* was in entering judgment for defendants non obstante veredicto.

*F. E. Beltzhoover,* with him *E. M. Biddle, Jr.,* for appellant. —To reform a written instrument on the ground of fraud the testimony must be clear, precise and indubitable.

The testimony in a case is indubitable when it satisfies the minds of the jurors (*a*) that the witnesses are credible; (*b*) that the facts are distinctly remembered, and (*c*) that the details are exactly narrated and are true: Spencer v. Colt, 89 Pa. 314.

If the witnesses are believed by the jury the testimony is indubitable and the jury are the sole judges of their credibility.

Fraud in fact is a question exclusively for the jury: Dornick v. Reichenback, 10 S. & R. 84 ; Jack v. Dougherty, 3 W. 151 ; Graham v. Smith, 25 Pa. 323 ; Loucheim v. Henszey, 77 Pa. 305.

On a question of fraud in a conveyance it is for the jury to say what weight is to be attached to the evidence: Painter v. Drum, 40 Pa. 467.

The credibility of the witnesses is exclusively for the jury: Lamb v. Irwin, 69 Pa. 436.

One who attempts to reform a contract on the ground of fraud is not required to restore that which in any event he would be entitled to retain either by virtue of the contract sought to be set aside or of an original liability : Kley v. Healy, 127 N. Y. 555 (28 N. E. Repr. 593); Ettinger v. Jones, 21 Atl. Repr. 137 ; R. R. Co. v. Lewis, 109 Ill. 120.

If a defendant obtains the signature of the plaintiff to a paper purporting to be a settlement and discharge of the cause of action by fraudulent representations that it is merely a receipt for a gratuity the plaintiff may maintain his action without returning the money paid him : Mullen v. R. R. Co., 127 Mass. 86 ; R. R. Co. v. Welch, 52 Ill. 183 ; O'Donnell v. Clinton, 145 Mass. 461 (14 N. E. Repr. 747) ; R. R. Co. v. Doyle, 18 Kansas, 58 ; Mateer v. Mo. Pac. Ry. Co., 15 S. W. Repr. 970 ; O'Brien v. Chicago, etc., Ry. Co., 89 Iowa, 644 (57 N. W. Repr. 425).

*Conrad Hambleton,* with him *John W. Wetzel,* for appellee.— A settlement between an insurer and an insured has all the elements of a contract, and is as incapable of rescission as any other contract: Georgia Home Ins. Co. v. Warten, 113 Ala. 479 (22 So. Repr. 288).

Where the assured accepts a compromise offer in settlement of a disputed loss under the policy, and gives a receipt in full, knowing it to be such, he cannot rescind the settlement as procured by fraud, without return of the money received: Harkey v. Mechanics', etc., Ins. Co., 62 Ark. 274 (35 S. W. Repr. 230) ; Light v. Zeller, 144 Pa. 582–592.

The evidence was not clear, precise and indubitable. The conscience of the chancellor was not moved to grant the relief sought, and it was therefore his duty to withdraw the case

from the jury: Boyertown Nat. Bank v. Hartman, 147 Pa. 558; Penna. R. R. Co. v. Shay, 82 Pa. 198; De Douglas v. Union Traction Co., 198 Pa. 430; Ogden v. P. & W. C. Traction Co., 202 Pa. 480; Williamson v. Carpenter, 205 Pa. 164.

Highlands and his wife are to be regarded as a single witness: Sower v. Weaver, 78 Pa. 443; Bitner v. Boone, 128 Pa. 567; Yost v. Mensch, 141 Pa. 73.

OPINION BY MR. JUSTICE MESTREZAT, May 23, 1904:

Edward Highlands, the plaintiff, owned and occupied a farm near Leesburg, in Cumberland county. The defendant company's road runs through the farm, and on the afternoon of January 30, 1900, the plaintiff's barn and all its contents, with some other property on the farm, were destroyed by fire caused by sparks emitted from the company's locomotives. The value of the property destroyed was $3,378.50, a part of which was insured for the sum of $2,100 in the Cumberland Valley Farmers' Mutual Fire Insurance Company, and the residue, of the value of $1,278.50, was not insured. The plaintiff gave immediate notice of his loss to the defendant company, and in two or three days thereafter, its agent, Mr. Bosworth, called to see him. Bosworth was informed of the value of the property destroyed and of the amount of the insurance. He said to the plaintiff that his company would not pay for the property that was insured, but would likely settle for the uninsured property. On February 12, 1900, Mr. Bosworth again went to see the plaintiff in reference to his loss. He found him at Leesburg and they with Reuben Karper, whose property had been destroyed by the same fire, drove to the plaintiff's home. After some discussion of the loss and the liability for it, Bosworth paid the plaintiff $1,100, in consideration of which the latter signed a release releasing the defendant company from all claims for damages, loss or injury " sustained by me in consequence of the fire alleged to have been caused by sparks from locomotive on my property near Leesburg, Pennsylvania, on January 30, 1900." The release stipulated that the payment of the money was not to be construed as an admission of liability in consequence of the accident.

The plaintiff brought an action in the common pleas of

Cumberland county against the Cumberland Valley Farmers' Mutual Fire Insurance Company to recover the amount of his policy. The defendant set up as a defense the release given the railroad company, alleging that it deprived the defendant company of the right of subrogation against the railroad company to which it was entitled under the terms of the policy. The plaintiff claimed that he had been fraudulently induced to execute the release, and undertook to reform it by showing by parol testimony that it was to be limited to the uninsured property destroyed by the fire. The trial court, however, held that as between the parties to that suit the testimony was not admissible to impeach the release, and this court sustained the ruling. (203 Pa. 134.)

On June 14, 1902, the present action was brought to recover from the defendant $2,100, the value of the insured property which the plaintiff alleges was destroyed by the negligence of the defendant company, and for which he "has never been in any manner compensated or paid, either by the said insurance company nor by the defendant company." On the trial of the cause, the defendant denied that the fire which destroyed the property was caused by its negligence, and as a further defense set up the release of February 12, 1900. The plaintiff denied the validity of the release so far as it purported to include or affect the property the loss of which is sued for in this action, and alleged that it was intended to be a discharge of the defendant from liability only for the loss on the uninsured property destroyed by the fire. He averred that the release in its present form was procured from him by fraud by the agent of the defendant; that when he executed it he was unable to read and that the company's agent in reading it to him " interpolated into it certain words that were not there to the effect that the payment was only to cover and be in satisfaction of the loss sustained on the property that was not insured." The trial court, after charging the jury that the testimony to change a written instrument must be clear, precise and indubitable, submitted for their consideration two questions: "First, whether or not the defendant was negligent in causing this fire; and secondly, whether or not the obtaining of a release by fraud has been established by evidence of the character I have spoken of." The verdict of the jury was for the plaintiff for the amount of his claim, and was taken subject to

two reserved questions : " First, whether the evidence offered by the plaintiff to avoid his release of the 12th of February, 1900, on the ground of fraud is indubitable ; and secondly, whether there is any evidence in the case which entitles the plaintiff to recover." Subsequently, the court entered judgment for the defendant, non obstante veredicto, holding that " the evidence is not of such a convincing nature that a court would be justified in accepting it as sufficient to alter the terms of the release, consequently it is our duty to so pronounce, notwithstanding the verdict." The right of the plaintiff to maintain this action while retaining the $1,100 which he received from the defendant was determined by the court on the trial of the cause in favor of the plaintiff, who is the appellant here, and need not be considered or determined on this appeal.

Before the plaintiff can recover in this action, he is compelled to reform the release of February 12, 1900, so that its terms will be confined to the property which is not included in the insurance policy. On the face of it, the instrument releases the defendant company from liability for the destruction of any and all of the plaintiff's property caused by the fire of January 30, 1900. If, therefore, the release correctly represents the contract entered into by the parties at the time it was executed, it is a complete defense to this action. The plaintiff, however, claims that it does not contain the agreement of the parties and alleges that in so far as it relates to the insured property it was obtained from him by the fraud of the defendant's agent. He, therefore, seeks to reform the instrument so that it will apply to and cover only the uninsured property. To accomplish this purpose, he invokes the equity powers of the court. Under our mixed system of jurisprudence, it is permitted in a common-law action to interpose an equitable defense, which, however, to be successful must be supported by proof of a character and degree that will satisfy the conscience of a chancellor. If he has failed to sustain his allegation of fraud by proof that would warrant a chancellor in reforming the release in an equitable proceeding instituted for the purpose, his attack on the instrument must fail here and will not avail him as a defense to this action. The duty of the trial judge and of this court in such cases is stated by STERRETT, J., in Rowand v. Finney, 96 Pa. 192, as follows : " Under our peculiar system of administering equitable

principles in common-law actions, the judge presiding at the trial performs the functions of a chancellor, and if his conscience is not moved to grant the equitable relief sought, it is his duty to interpose, either by withdrawing the case from the jury, or by refusing to receive or enter judgment on a verdict that is contrary to equity and good conscience. As a judge, he ought not to permit a jury to do what he, as a chancellor, would not sanction. When the requisite kind or degree of proof is wanting, the better practice is for the court to give the jury binding instructions, and thus withdraw the case from their consideration. A duty somewhat similar devolves on this court, when cases, grounded on equitable principles, are brought here on writs of error. If, upon a review of the testimony, we are satisfied that the evidence was insufficient, and that the case should not have been submitted to the jury, or that the instructions of the court below were inadequate, we should reverse." On the other hand, where the character and measure of proof are sufficient to satisfy the conscience of the trial judge, were he sitting as a chancellor, that the party is entitled to the equitable relief he seeks, the case should be submitted with proper instructions to the jury, and a verdict in accordance with the proof should be sustained. If, when such proof is submitted, the judge refuses to send the case to the jury, or having submitted it to the jury and the verdict is in accord with the proof but is set aside, the action of the court may be reviewed, and the right of the party to equitable relief may be enforced on appeal.

The degree or measure of proof required to reform a written instrument on the ground of fraud, accident or mistake, has been the subject of frequent consideration by this court. In Boyertown National Bank v. Hartman, 147 Pa. 558, STERRETT, J., quoting from Hart v. Carroll, 85 Pa. 508, states the rule thus : "The standard of proof in such cases (suits to reform written instruments) is 'clear, precise and indubitable.' What is meant by 'indubitable' proof, in connection with such cases, is evidence that is not only found to be credible, but of such weight and directness as to make out the facts alleged beyond a reasonable doubt. In the very nature of things, that conclusive and absolute proof, which results from the production of record evidence, or rests on the solution of a mathematical problem, can never be the effect of the verbal testimony

of witnesses.  The language of the authorities must be considered in its relation to the subjects and instrumentalities to which it is applied."

Again, in Honesdale Glass Co. v. Storms, 125 Pa. 268, it is said that "in all this class of cases, the evidence must be clear, precise and indubitable ; not indubitable in the sense that there must be no opposing testimony, but in the sense that it must carry a clear conviction of its truth."

In his charge to the jury the trial judge stated the degree of proof required to reform a written instrument as follows: "It (the evidence) must be in the language of the law, clear, precise and indubitable ; not indubitable in the sense that there must be no opposing testimony, but in the sense that it must carry a clear conviction of its truth to the minds of the jury.  What is meant by the term indubitable is that the evidence to sustain a claim such as that of the plaintiff in this case must not only be found to be credible, but it must be of such weight and directness as to carry a clear conviction of its truth to the minds of the jury."  This is substantially the language used in our decisions to define the degree of proof required to reform a written instrument procured by fraud.  The jury, by its verdict, finds that the plaintiff produced such proof on the trial of the cause.  The court as appears by the form in which he states the reserved question concedes that the proof of the alleged fraud was clear and precise but denies that it was indubitable, and for this reason declined to enter judgment on the verdict in favor of the plaintiff.  The correctness of this ruling is the question for determination on this appeal.

Applying to the testimony in this case the rule as to the measure of proof in cases of this character, we are of opinion that the learned trial judge erred in directing judgment to be entered for the defendant.  His action in directing the entry of the judgment was, as appears by his opinion, manifestly controlled in a large measure by the failure of the plaintiff and his wife to make an explanation, satisfactory to him, of alleged inconsistencies in their testimony given on the two trials relative to the fraudulent representations by which the plaintiff was induced to sign the release.  While different language was used by them in testifying on the two trials as to the al-

leged fraudulent conduct of the defendant's agent, yet we think
its meaning is substantially the same in each case.

It is not denied by the defendant company that the plaintiff's
property was destroyed by the fire which originated from sparks
emitted from the company's locomotive, nor that the value of
the property thus destroyed was $3,378.50. It was found by
the jury, as we have seen, that the fire was the result of the de-
fendant's negligence, and this finding was sustained by the
trial court. It further appears that at the time of the fire, the
property destroyed was insured in the sum of $2,100, and the
uninsured property was of the value of $1,278.50. The con-
trolling question in the case, therefore, as suggested above, is
the validity of the release so far as it affects the insured prop-
erty. The jury denied its validity, but the court held that the
evidence to reform it was not indubitable and hence sustained
it. Highlands testified in detail as to all the negotiations be-
tween himself and the insurance company and the railroad
company from the time the property was destroyed until after
the release was procured from him. His testimony is direct
and positive. He says that at the first interview, shortly after
the fire, he told Bosworth the amount of the insurance, and
that Bosworth said that his company would likely settle for
" the $1,278.50 worth of uninsured property." Bosworth went
again on February 12, 1900, to see the plaintiff in regard to the
matter. He met Highlands and Reuben Karper at Leesburg
and the three drove to the plaintiff's home. On the way Bos-
worth inquired if the insurance company had done anything
for the plaintiff, and receiving a negative reply, said that the
railroad company would not pay the whole loss, but had sent
him there to pay for the uninsured property. At the house,
the plaintiff says he agreed with Bosworth to accept $1,100
" provided he did not ask me to sign a release that would re-
lieve the insurance company from paying me my money."
Bosworth then said to Highlands " that the railroad company
did not intend to pay for anything that was insured ; the $1,100
we are paying you and the release we want you to sign is only
a payment under the release for the goods that was burnt that
was not insured and cannot relieve the insurance company."
A release was produced but the plaintiff's eyes were so badly
injured by the fire that he could not read it. He requested

Bosworth to read it, but was informed by the latter that "it was not necessary, that it was only a payment under the release for the goods that was burnt that was not insured." The plaintiff, however, declined to sign the paper until it was read, and thereupon Bosworth agreed to read it. "He then," as the plaintiff testifies, "read part of that release and brung in this statement that the payment of $1,100 I am making you and the release is only a payment under the release for the goods that was burnt that was not insured." Highlands then left the house a few moments to reflect on the advisability of signing the release, and when he returned his wife informed him that Bosworth, during his absence, said to her "that he has told you over and over that the payment he is making you and the release he wants you to sign are only a payment and a release for the goods that were burnt and were not insured and has nothing to do with the insurance." After being assured that the release covered only the uninsured property, and it being so provided in the instrument read to him, Highlands signed the paper. He testified that he would not have done so had it not contained the restrictive clause.

Mrs. Highlands's testimony is equally distinct and positive as to what occurred at the house when the release was signed. She fully corroborates her husband as to every material matter that took place on that occasion between Bosworth and the plaintiff. Reuben Karper corroborates Highlands as to the conversation which took place between the two men as they were driving from Leesburg to the plaintiff's home. He further testifies that while they were in the house Bosworth said to Highlands: "This release that you are to sign and the money that I pay you, he said, has nothing to do with the insurance nor the insurance company; it is merely to cover outside of what was not insured." John Stamy, since deceased, also had property destroyed by the fire of January 30, 1900. After Mr. Bosworth had procured the release from Highlands, the latter took him to see Stamy whose loss he adjusted. Mrs. Stamy testifies that Bosworth then said that he had paid Highlands for that part of his property destroyed by the fire that was not insured.

This, in part, is the direct testimony offered by the plaintiff to reform the release. It is met on the part of the defendant company by the instrument itself, by the testimony of Mr.

Bosworth, and by the alleged contradictory statements of High-lands and his wife in their testimony on the two trials. Bos-worth says that at the time when they adjusted the plaintiff's loss at the latter's home, on February 12, 1900, he told the plaintiff that if he were willing to sign a release releasing the railroad company for the fire, he would pay him $1,100, and that after some talk about the matter, they settled. He testi-fied that on this occasion he read to Highlands the release word for word as it is written and denies that in reading it he interpolated anything in it that was not contained in the instru-ment itself.

Aside from his positive declaration that he read the release in the language in which it was written, we think Mr. Bos-worth's testimony corroborates the evidence on the part of the plaintiff as to what occurred prior to, and at, the time the release was executed. In fact, with the one exception, there is very little difference between his testimony and that of the plaintiff and his witnesses as to the details of the occurrences leading up to the execution of the release. They substantially agree as to what took place at both interviews, save the denial of Bosworth that he misread the release to the plaintiff when it was signed.

We do not regard the testimony of the four officers of the fire insurance company, called as witnesses on the part of the defendant company, as tending to sustain the contention that Bosworth read the release correctly to the plaintiff. On the contrary, the testimony seems to indicate that the insurance officials anticipated that the defendant's agent would overreach the plaintiff just as the plaintiff alleges he did. George H. Stewart, one of the witnesses, testifies that he saw Highlands prior to his settlement with the railroad company, gave him the form of a receipt to be signed and delivered to the company, and admonished him to be careful to do nothing that might invalidate his insurance " by signing some papers such as rail-road companies usually have." The substance of the testimony of the three other witnesses is that they together called on High-lands and that he said the railroad company would not accept a release in the form given him by Mr. Stewart and that he had signed the release presented by the company, that " he was ignorant of these things " and that if he had made a mistake it

was through ignorance on his part. We do not see how such testimony can aid the defendant. It shows that it was not the intention of the plaintiff on payment of the one third of his loss to give a release that would prevent him recovering the residue, and that if he did so, it was through his ignorance of the effect of the release the defendant's agent required him to sign. We do not think the testimony of the plaintiff and his wife taken on the present trial is necessarily in conflict with their testimony on the former trial. Bosworth admits that he read the release to the plaintiff just before it was executed and the plaintiff's testimony on the former trial was that he signed it by reason of the fraudulent representations then made to him. From this testimony, the jury could well find that the substance of the representations were embodied in the release and that the defendant's agent so read the instrument to the plaintiff.

We are of opinion that the testimony adduced at the trial was ample to sustain a chancellor in reforming the release set up as a defense of this action. All the probabilities arising from the testimony in the case are against the position of the defendant. With the knowledge that his loss exceeded $3,300, it is incredible that the plaintiff, although illiterate, was willing to release his entire claim against a solvent company on payment of $1,100. It is true that he expected to get the insurance money, but, as the testimony conclusively shows, he persistently insisted on every occasion when the matter was discussed, that his settlement with the railroad company was strictly confined to the uninsured property. There is no reason disclosed by any testimony in the case, nor can any be assigned, why he should accept in satisfaction of his claim less than one third of his total loss. On the other hand, the evidence clearly shows that in all of his negotiations with the representatives of both the insurance company and the railroad company, he distinctly asserted his intention to collect the entire loss. Bosworth's own testimony leaves no doubt that such was Highlands's intention. It is, therefore, inconceivable that he would with a knowledge of its contents, execute the release in question which would deprive him of his right to recover two thirds of his loss.

We are fully convinced that in executing the instrument in question, the plaintiff did not intend to release the defendant

from its liability for his entire loss, and that the release set up as a defense in this action was procured from him without his knowledge that it included the property and that as read to him by the defendant's representative it was limited to the uninsured property. We are, therefore, compelled to reverse the judgment, which we now do, and direct the court below to enter judgment on the verdict for the plaintiff.

MITCHELL, C. J., dissents.